United States Court of Appeals
Fifth Circuit

**F I L E D**

December 20, 2005

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————————————

No. 05-30137

———————————————

In The Matter Of: ROBERT G. QUINLIVAN; KIMBERLY A. QUINLIVAN,

Debtors

------------------------------------------

TUMMEL & CARROLL,

                                                                                    Appellant,

versus

ROBERT G QUINLIVAN; KIMBERLY A QUINLIVAN

                                                                                    Appellees.

—————————————————————————————

Appeal from the United States District Court
For the Eastern District of Louisiana

—————————————————————————————

Before GARWOOD, CLEMENT and PRADO, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

    Tummel & Carroll, a Texas law firm, appeal the district court's affirmance of the bankruptcy

court's discharge of Robert Quinlivan's ("Quinlivan") debt to Tummel & Carroll. For the reasons

discussed below, we remand to the bankruptcy court for findings regarding the relevant state agency

law, and whether, under the relevant state agency law, Donald Totten acted as Quinlivan's agent in

1

securing the services of Tummel & Carroll.

## FACTS AND PROCEEDINGS

In early 1993, Donald Totten, a California resident, contacted Tummel & Carroll ("T&C"), a general partnership law firm located in Dallas, Texas, to request legal services for Worldwide Floral, Inc., ("WFI") and Worldwide Floral Exchange ("WFE"), both Louisiana corporations. Totten sought representation for the companies in connection with disputes with financial institutions. At the time, Totten served as the President of WFI, and Robert Quinlivan was the vice-president of WFE.

Totten made numerous representations in order to induce T&C into a contingent-fee legal services contract. For example, he said that he was a wealthy investor, that he was familiar with commercial litigation and how expensive it is, and that he was financing the business of the prospective clients. In addition, he represented that the bank wrongfully had terminated a Visa/Mastercard merchant account that had been established for WFI and WFE, that the bank wrongfully had placed WFI and WFE on a list of "terminated" merchants, that this action by the bank was causing prospective clients to sustain losses of $10,000 to $20,000 per day, and that efforts by the prospective clients to obtain replacement financing from "unregulated" lenders had resulted in associated additional losses to the prospective clients of approximately $200,000. Totten did not disclose the fact that information used to obtain the merchant account contained false or misleading information.

On February 18, 1993, Totten and Quinlivan signed a retainer agreement with T&C for representation on a contingency-fee basis. The contract was signed by Quinlivan in his individual capacity, by Quinlivan as vice-president of WFE, and by Totten as president of WFI. T&C filed suit against the bank on behalf of Quinlivan in his individual capacity, WFE, and WFI in a Texas state

court. Initially, T&C sought a temporary injunction requiring the bank to remove WFI and WFE from the terminated merchant list. During the hearing, John Fricke, an employee and officer of WFE, testified that WFE's merchant account contained false and misleading information. In particular, Fricke stated that Craig James was not an owner of WFE but his name had been placed on the application because, unlike Totten and Quinlivan, he had a good credit history. He also stated that the credit card sales volumes were not as represented in the application. Following the hearing, the Texas court then denied the request for a temporary injunction. The court noted that Totten and Quinlivan had come into court with "unclean hands" because the merchant account application contained false information.

Shortly after the court denied the temporary injunction request, Totten and Quinlivan told T&C that they no longer wished to pursue their claims against the bank. Pursuant to the contract, T&C gave Totten and Quinlivan notice that, because they decided to withdraw their claims, they owed T&C for legal services rendered on an hourly basis. After Totten and Quinlivan failed to pay the invoiced charges, T&C pursued the matter in Texas state court. T&C sued Totten, Quinlivan, WFE, and WFI for breach of contract and sued Totten for fraud. The claim against Quinlivan was resolved on summary judgment, and T&C was awarded $45,222.20 plus six percent pre-judgment interest and reasonable attorney's fees. *Tummel & Carroll v. Quinlivan* (In re *Quinlivan*), No. 04-2055, slip op. at 2–3 (E.D. La. Dec. 24, 2004). Quinlivan was then severed from the case against Totten; the fraud case against Totten settled; and the Texas court awarded T&C $36,000 of damages against Totten based on a theory of quantum meruit. The state court's summary judgment decision contains no findings that Quinlivan incurred the debt in question under false pretenses. The Texas

3

judgment was made executory in Louisiana in 1994, with prior Notice and Petition to Enforce Foreign Judgment served on Quinlivan.

On October 11, 1996, Quinlivan and his wife filed for bankruptcy under Chapter 7. Quinlivan failed to list as a liability T&C's judgment, which was in excess of fifty percent of the total value of creditors' claims against Quinlivan. T&C learned of the bankruptcy case in 2002 when Quinlivan and his wife sought to reopen the case in order to obtain a discharge of their debt to T&C because the judgment had impressed a lien on real estate that Quinlivan inherited after his bankruptcy discharge.

T&C filed a complaint to exempt the dischargeability of the debt from the Louisiana executory judgment, and the bankruptcy court conducted a hearing in May and June of 2004. The court analyzed whether 11 U.S.C. § 523(a)(2)(A) prohibited discharge of T&C's breach of contract judgment by applying the five factor test set forth in *RecoverEdge v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995). Under *RecoverEdge*, the creditor must prove: (1) the debtor made representations; (2) at the time they were made the debtor knew that they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations. *Id*. The bankruptcy court held that Quinlivan made no fraudulent representations to T&C and, therefore, § 523(a)(2)(A) did not bar discharge of T&C's debt. *Tummel & Carroll v. Quinlivan* (In re *Quinlivan*), Ch. 7 Case No. 96-14923, Adv. No. 02-01249, slip op. at 155 (E.D. La. July 21, 2004). It also found that any representations by Totten were "not made in the presence of the debtor [Quinlivan] nor was there any indication that the debtor joined in or ratified [Totten's representations]." *Id*. at 153–54. Except for a conclusory statement finding that Totten was not Quinlivan's agent, the court did not address whether Totten's representations were fraudulent and,

4

if they were, whether they should be imputed to Quinlivan. Rather, the bankruptcy court ruled that because Quinlivan did not engage in fraudulent behavior himself, his debt to T&C was not excepted from discharge under § 523(a)(2)(A).

On appeal to the district court, T&C did not challenge the bankruptcy court's holding that Quinlivan did not commit fraud, but rather challenged the court's failure to find Quinlivan responsible for Totten's allegedly fraudulent representations under the relevant agency and partnership law. The district court held that because there was no "formal agency agreement, as determined under state law" between Quinlivan and Totten, T&C could not invoke the § 523(a)(2)(A) exception. *See Tummel*, No. 04-2055, at 10.

The bankruptcy court also held that Quinlivan's failure to list the T&C judgment, in violation of § 523(a)(2)(A), was due to inadvertence. Therefore, the debt remained dischargeable. *Stone v. Caplan* (In re *Stone*), 10 F.3d 285, 290 (5th Cir. 1994) (noting that where the failure to list was due to inadvertence, "equity points toward discharge of the debt"). T&C did not challenge this holding on appeal to the district court and does not challenge it now.

Pursuant to 28 U.S.C. § 1291, T&C appealed the final judgment of the district court.

## DISCUSSION

### A. Standard of Review

This Court reviews a bankruptcy court's conclusions of law *de novo*, findings of fact for clear error, and mixed questions of law and fact *de novo*. *See* In re *Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000). Only upon a definite and firm conviction that the bankruptcy court erred should this Court reverse findings of fact. *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985).

### B. Dischargeability under the Bankruptcy Code

5

Section 523(a)(2)(A) of the bankruptcy code excepts from discharge in bankruptcy "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

Exceptions to dischargeability should be construed in favor of the debtor. *See Fezler v. Davis* (In re *Davis*), 194 F.3d 570, 573 (5th Cir. 1999). However, this principle cannot be used to overcome the plain language of the bankruptcy code. *See Deodati v. M.M. Winkler & Assocs.* (In re *M.M. Winkler)*, 239 F.3d 746, 751 (5th Cir. 2001). Because the plain language of § 523(a)(2)(A) is designed to protect victims of fraud, this Circuit has construed § 523(a)(2)(A) to except debt incurred as a result of a business partner's fraud. *See id.*; *see also Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998) (noting that Congress intended § 523(a)(2)(A) to protect victims of fraud more than defrauding debtors); *Strang v. Bradner*, 114 U.S. 555, 561 (1885) ("[I]f, in the conduct of partnership business, . . . one partner makes false or fraudulent misrepresentations of fact to the injury of innocent persons who deal with him as representing the firm, and without notice of any limitations upon his general authority, his partners cannot escape pecuniary responsibility therefor upon the ground that such misrepresentations were made without their knowledge.").

Despite the more general purpose of the bankruptcy code, which is to give debtors a fresh start, § 523(a)(2)(A) captures a competing principle. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) (discussing the limits of the bankruptcy code's "fresh start" policy). Section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect the victims of fraud. *See Winkler*, 239 F.3d at 749 (noting that "whether the debt arises from fraud is the only consideration material to nondischargeability"). Holding the debtor accountable for his partner's fraud "effectuates important

6

state law policies regarding imputed liability." *Id*. at 751. These state law policies create incentives for the debtor to control or monitor the conduct of his agent or partner. *See id*. As a result, when determining whether the exception applies, the culpability of the indebted partner is irrelevant. Even if the partner is innocent of wrongdoing and had no knowledge or reason to know of the fraud, the debt is not dischargeable under § 523(a)(2)(A). *See id*. at 749; *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1282 (5th Cir. 1992) (noting that for the purposes of dischargeability fraud can be imputed to an innocent partner regardless of knowledge or involvement). Of course, the debt in question must be one for which the debtor is liable to the creditor under applicable nonbankruptcy law.

Therefore, if Totten acted as Quinlivan's partner or agent and Totten committed fraud in incurring debt to T&C, then Quinlivan's debt to T&C is not dischargeable under § 523(a)(2)(A).

## C. Totten and Quinlivan's Relationship

This circuit imputes fraud to debtors only if the fraudulent representations were made by a formal partner or agent. The relationship between the parties is analyzed under state law. *See, e.g., Winkler*, 239 F.3d at 751 ("We conclude that if a debt arises from fraud and the debtor is liable for that debt under state partnership law, the debt is nondischargeable under § 523(a)(2)(A).").

The precise nature of the relationship between Totten and Quinlivan is difficult to discern. The bankruptcy court made no substantive findings regarding the formal relationship between Totten and Quinlivan. Rather, the judge simply made the conclusory statement, "Well, I don't find the requisite agency relationship [between Totten and Quinlivan]." *Tummel*, Ch. 7 Case No. 96-14923, at 136. This conclusion appears to be based on the fact that there was no evidence before the court that

7

Quinlivan knew of Totten's fraud. For example, after T&C argued that Totten's fraud could be imputed to Quinlivan, the court noted:

> Well, how and why? Is Mr. Totten—you successfully proved that Mr. Totten made some representations, and whether they were false at the time they were made or not, but let's just assume that they were. But how do you show that these should rest on the debtor, Mr. Quinlivan's doorstep. And how do you show that they were false—that he knew—he being the debtor—knew that they were false at the time that they were made? And how do you show that he, Mr. Quinlivan, made these representations for the purpose of deceiving this particular creditor, this law firm. I don't find that there were any representations [ ] made at all by Mr. Quinlivan prior to the signing of the retainer agreement.

*Id.* at 135–36.

The bankruptcy court's conclusion erred in conflating the inquiry regarding whether Quinlivan knew about Totten's representations and whether Totten was acting as Quinlivan's agent. Under *Winkler*, debt incurred as a result of fraud cannot be discharged even if the debtor did not know or had no reason to know that his agent was acting fraudulently. *See Winkler*, 239 F.3d at 749.

**CONCLUSION**

Therefore, we REMAND this case to the bankruptcy court for a determination of whether Totten acted as Quinlivan's agent in negotiating the contract with T&C. In addition, because the bankruptcy court made no finding regarding which state's agency law to apply in determining whether an agency relationship existed, we REMAND for a choice-of-law determination with regard to which state's law is to be applied to determine whether Totten acted as Quinlivan's agent. If, on remand, the bankruptcy court finds that Totten was acting as an agent for Quinlivan, the court should further inquire into whether Totten indeed committed fraud in securing the T&C contract for legal representation.

8